UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RUTH BURLEIGH, as Personal
Representative of the Estate
of ERNEST BURLEIGH,
    Plaintiff,

  v.

                                         CIVIL ACTION NO.
                                         16-11030-RGS

ALFA LAVAL, INC., et al.,
    Defendants.


**MEMORANDUM AND ORDER RE:**
**DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION**
**TO APPLY MAINE SUBSTANTIVE LAW**
**(DOCKET ENTRY # 161)**

**May 9, 2018**


**BOWLER, U.S.M.J.**

Defendant General Electric Corporation ("GE") seeks to apply Maine law to a number of substantive issues in this asbestos product liability and personal injury action. (Docket Entry # 161). Plaintiff Ruth Burleigh, as personal representative of the estate of Ernest Burleigh ("plaintiff"), maintains that Massachusetts law applies. (Docket Entry # 170).

As set out in the amended complaint, plaintiff, the widow of Ernest Burleigh ("Burleigh"), alleges that Burleigh died in July 2016 of mesothelioma as a result of exposure to asbestos while working as a mechanic at the Portsmouth Naval Shipyard ("the shipyard") from 1960 to 1981. (Docket Entry # 134, ¶¶ 2, 3, 4, 22). The amended complaint, which seeks compensatory and

punitive damages, sets out counts against all defendants for
negligence;[1] breach of express and implied warranties; wrongful
death;[2] loss of consortium; and malicious, willful, wanton, and
reckless conduct or gross negligence.[3]  GE filed an answer to the
original complaint asserting that it "adopts the master cross
claim against all defendants." (Docket Entry # 22, p. 19).  GE
therefore asserted a crossclaim for contribution against "co-
defendants" as "joint tortfeasors with regard to plaintiff's
damages."  Model Cross-Claim of Defendants, Massachusetts
Asbestos Litigation Pre-Trial Order No. 9, Amended June 27, 2010,
Ex. C.  GE did not file an answer and crossclaim to either the
first or second amended complaints, which added the wrongful
death claim.[4]  (Docket Entry ## 84, 134).

_____

[1]  The negligence claim asserts a negligent failure to warn
about the dangers of asbestos-containing products as well as
negligent conduct in the manufacture and sale of asbestos-
containing products.  (Docket Entry # 134).

[2]  Plaintiff brings the wrongful death claim "individually
and as personal representative of the estate of Ernest Burleigh"
along with "Robert Burleigh, Richard Burleigh, Randall Burleigh,
and Doris Edenfield" (Docket Entry # 134, ¶ 43) (capitalization
omitted), Burleigh's children (Docket Entry # 170-1, pp. 12-15).

[3]  The amended complaint includes additional counts against
defendant Metropolitan Life Insurance Company ("MetLife").
Plaintiff, however, settled the claims against MetLife.  (Docket
Entry # 156).

[4]  In the event GE wishes to continue to assert the
crossclaims, it is directed to file a motion for leave to file an
answer to the amended complaint (Docket Entry # 134) with
crossclaims against any coparties.  See generally Klunder v.
Brown University, 778 F.3d 24, 34 (1st Cir. 2015).  This court

Stipulations of dismissal and a settlement order of dismissal leave GE, defendant Crane Co. ("Crane"), defendant Warren Pumps, LLC ("Warren"), and defendant Ingersoll-Rand Company ("IR") as the remaining defendants.  (Docket Entry ## 143, 146, 156, 190, 192).  That said, at the hearing on the motion to apply Maine law, plaintiff represented she had settled her claims against IR and, as a result, this court deemed IR's motion to join GE's motion (Docket Entry # 167) moot.[5]  (Docket Entry # 186).  Crane and Warren separately move to join GE's motion (Docket Entry ## 181, 182) and plaintiff moves to strike both motions (Docket Entry # 183).[6]

GE and plaintiff agree that GE is a New York corporation with a principal place of business in Massachusetts.[7]  (Docket Entry # 162, p. 8) (Docket Entry # 170, p. 3).  The amended complaint alleges that Crane is a Delaware corporation with a

_____

expresses *no* opinion on the merits of such a motion.

[5]   The docket does not reflect a stipulation of dismissal of IR or a settlement order of dismissal.  Plaintiff and IR are therefore directed to file a stipulation of dismissal or a proposed order of dismissal within 30 days of the date of this opinion.

[6]   Neither Crane nor Warren filed an answer to the amended complaint (Docket Entry # 134).  In the event they wish to assert crossclaims for contribution, they are directed to file motions for leave to file an answer to the amended complaint (Docket Entry # 134) with crossclaims against any coparties.  This court expresses *no* opinion on the merits of such a motion.

[7]   The amended complaint alleges that GE has a principal place of business in Connecticut.  (Docket Entry # 134, ¶ 15).

principal place of business in Connecticut and Crane describes itself as "a Connecticut based company." (Docket Entry # 134, ¶ 13) (Docket Entry # 184, p. 3). Warren is purportedly a Delaware corporation with a principal place of business in Massachusetts. (Docket Entry # 134, ¶ 13).

## FACTUAL BACKGROUND[8]

Born in 1931, Burleigh resided in Maine throughout his life except for a four-year period in North Carolina from 1955 to 1959. (Docket Entry # 161-1, pp. 2-3, 11-13, 15). Prior to working in North Carolina, Burleigh worked in Maine at a movie theater, a service station, a shoe factory where he did not work in the vicinity of insulated piping, a textile mill, a motor company changing oil and greasing cars, and another motor company as a car salesman. (Docket Entry # 161-1, pp. 4, 6-11). In North Carolina, he worked at a textile mill "as a loom fixer." (Docket Entry # 161-1, p. 11). He was not aware of any dyes or solvents applied to the fabric at the mill. (Docket Entry # 161-1, p. 14). Upon his return to Maine in 1959, he worked briefly at a few other jobs, including one in New Hampshire for three months, before beginning work at the shipyard in July 1960.

---

[8]   Facts are recounted solely for purposes of determining whether to apply Massachusetts or Maine law. A different standard of review enures on summary judgment and a different record will be present at trial. Accordingly, the facts in this opinion as to causation and other matters are not the law of this case.

(Docket Entry # 161-1, pp. 14-15, 18-20) (Docket Entry # 170-1, pp. 58-59, 62-69).  He worked at the shipyard from 1960 until his retirement in 1994.  (Docket Entry # 161-1, p. 20).  The shipyard is located in Kittery, Maine, approximately 20 miles from the Massachusetts border.  (Docket Entry # 170-3).

After an initial four-year apprenticeship at the shipyard, Burleigh became a mechanic.  During the apprenticeship, he worked three-quarters of the time onboard four submarines being built and one "quarter of the time in the shop."  (Docket Entry # 170-1, pp. 73-75, 81, 103).  In the shop, he made flange gaskets and repaired valves.  (Docket Entry # 170-1, pp. 75-80).  Onboard the submarines, he fitted doors and worked on valves and pipes.  In an engine room onboard one of the submarines, he worked on steam turbines and generators ("SSTGs") manufactured by GE.  (Docket Entry # 170-1, pp. 82-86, 89, 91-93).

When Burleigh became a mechanic in 1964, he performed the same work in the shop.  (Docket Entry # 170-1, pp. 103-104, 107).  He also worked in the engine room and the auxiliary machine room ("AMR") onboard submarines being overhauled.  (Docket Entry # 170-1, pp. 91-92, 107-108, 111-112, 114-116) (Docket Entry # 170-2, pp. 27, 30-31).  The temporal breakdown of his work remained about the same, i.e., approximately three quarters onboard submarines and one quarter in the shop.  (Docket Entry # 170-1, pp. 103-104).  Burleigh described his work in submarine engine

rooms as "all around engine room work," including work on SSTGs. (Docket Entry # 170-1, p. 106-107, 110).  His work in engine rooms and AMRs involved, inter alia, working on a number of different kinds of pumps, such as those manufactured by Warren. (Docket Entry # 170-2, pp. 33, 35-37, 39-42).  When an existing pump was beyond repair, Burleigh installed a new pump, a process that generated dust.  (Docket Entry # 170-2, pp. 42-46). Burleigh's exposure to dust additionally occurred when he repaired existing pumps, including when he removed the packing or replaced the gaskets.  (Docket Entry # 170-2, pp. 46-50). Burleigh does not "recall seeing warnings regarding the dangers of asbestos on any [of the] pumps [he] installed or repaired" at the shipyard.  (Docket Entry # 170-2, pp. 53-54).  In fact, he does not remember seeing warnings regarding the dangers of asbestos on any of the products he worked with at the shipyard or in manufacturer-supplied manuals that he used.  (Docket Entry # 170-2, pp. 54-56, 73-74, 84-86)).  Burleigh's removal and replacement of asbestos-containing gaskets on pipes that led to turbines in the engine room similarly generated dust.  (Docket Entry # 170-2, pp. 76, 79-81) (Docket Entry # 170-4, pp. 54, 56).

During this time period, GE designed and supplied steam turbines to the shipyard for a number of the submarines where

Burleigh worked.[9]  (Docket Entry # 170-2, p. 76) (Docket Entry # 170-4, pp. 27-29).  GE factories in Lynn and Fitchburg, Massachusetts manufactured all of GE's marine steam turbines during the relevant time period.  (Docket Entry # 170-4, pp. 29-30).  The United States Navy ("the Navy") initially supplied GE with specifications for the design of a steam turbine tailored for a particular ship.  (Docket Entry # 170-4, p. 34).  "Once the design was complete and approved, then GE would commence the manufacture, order materials," and then produce and assemble the turbine in one of the two Massachusetts factories.  (Docket Entry # 170-4, p. 35).  After assembling the turbine, GE tested "the turbine with steam and speed" to ensure it met the design specifications.  (Docket Entry # 170-4, p. 35).  Thereafter, GE disassembled the turbine and shipped it from the Massachusetts factory to either a Navy storage facility or a Navy shipyard.  (Docket Entry # 170-4, pp. 35-36).

GE did not provide insulation for the turbines.  Rather, it shipped the marine steam turbines to the shipyard in a non-insulated state.  (Docket Entry # 170-4, pp. 48-49, 51).  With respect to construction of new submarines, workers installed the insulation at the shipyard in Maine around all or a portion of the exterior casings of GE's turbines.  (Docket Entry # 170-4,

---

[9]  Burleigh recalls two other manufacturers that supplied these turbines.  (Docket Entry # 170-2, p. 76).

pp. 46-48).  GE did not provide the insulation, whether composed of asbestos or other material such as ceramic wool, for its rebuilt turbines as well as its new turbines.  (Docket Entry # 170-4, pp. 48-50).

GE also purchased asbestos-containing gaskets as finished pieces, applied or installed them on the exterior of turbines, and shipped the gaskets along with the turbines to the shipyard or a Navy storage facility.[10]  (Docket Entry # 170-4, pp. 35, 54-58, 60).  In addition to installing the gaskets, GE supplied asbestos-containing gaskets as "loose part[s,]" which it shipped with the turbines to a Navy shipyard or a Navy storage facility.  (Docket Entry # 170-4, pp. 35, 56, 60).

Burleigh additionally worked on certain kinds of valves onboard submarines and remembers seeing the name Crane on "steam or hot water" valves.  (Docket Entry # 170-2, pp. 55-56, 60-61, 71).  Installing a new valve "[s]ometimes" entailed cutting the packing or installing a gasket, which, in turn, generated dust that Burleigh breathed.  (Docket Entry # 170-2, pp. 64-67).  At times, Burleigh's work repairing valves involved removing old packing and inserting new packing, which again generated dust.  (Docket Entry # 170-2, pp. 67-69).  GE's marine turbine expert described the valves as sealed by asbestos-containing packing at

_____

[10]   In addition, "the Navy maintained [its] own parts depot facility where [it] tended to purchase" gaskets, nuts, and bolts directly from different vendors.  (Docket Entry # 170-4, p. 61).

the interface of the valve stem and the turbine's steel casing. (Docket Entry # 170-4, pp. 58-59).  GE supplied the asbestos-containing packing along with a GE turbine when it shipped the turbine "out to a shipyard or the Navy."  (Docket Entry # 170-4, pp. 58, 60).

During Burleigh's work at the shipyard, a GE representative, Carl Tidd ("Tidd"), at times worked at the shipyard as "a liaison between General Electric and the shipyard."  (Docket Entry # 170-2, pp. 90-92).  As a general rule, GE representatives were usually at a shipyard to supervise the installation of a turbine. (Docket Entry # 170-4, pp. 38-39).  "Typically," a GE field representative would *not* be present or "called in to supervise" the insulation of a GE turbine.  (Docket Entry # 170-4, pp. 52-54).  As indicted, insulating a turbine with asbestos, if any, took place at the shipyard as opposed to one of GE's plants in Massachusetts.  (Docket Entry # 170-4, pp. 45-46, 48-49). Although Tidd was at the shipyard for "quite a while," Burleigh did not get to know him.  (Docket Entry # 170-2, p. 92).  In addition to the on-site representative during the installation process, GE had a customer service department in Massachusetts as the single point of contact to answer questions throughout the life of a turbine.  If needed, a member of the department would travel to the shipyard to provide technical support.  (Docket Entry # 170-7, pp. 25-27).

In October 1981, Burleigh left his job as a mechanic and
began working as an equipment specialist at the shipyard.
(Docket Entry # 170-1, pp. 73-74).  Once he became an equipment
specialist in 1981, Burleigh no longer worked onboard submarines
and eventually retired in 1994.  (Docket Entry # 170-1, pp. 73-
74, 116, 122) (Docket Entry # 161-1, p. 20).

In late 2015, Burleigh was diagnosed with mesothelioma.
(Docket Entry # 170-2, p. 93).  He received his medical treatment
for the condition in Maine.  (Docket Entry # 161-1, pp. 24-28).
He died in July 2016.  (Docket Entry # 134, ¶ 4).

DISCUSSION

I.  <u>The Conflicts at Issue</u>

"The first step in a choice of law analysis is to determine
whether an actual conflict exists between the substantive laws of
the interested jurisdictions." <u>Reicher v. Berkshire Life Ins.
Co. of Am.</u>, 360 F.3d 1, 4 (1st Cir. 2004).  Seeking to apply
Maine law, GE identifies various conflicts with Maine law
including caps on damages and the burden of proof in a wrongful
death claim.  Plaintiff submits that Massachusetts law applies to
the issues regarding the wrongful death claim.

Maine limits the amount of punitive damages in a wrongful
death action to $250,000.  Me. Rev. Stat. Ann. tit. 18-A, § 2-
804(b) ("jury may also give punitive damages not exceeding
$250,000" in "wrongful death action").  Maine also caps the

amount of non-economic, compensatory damages in a wrongful death action at $500,000.  Me. Rev. Stat. Ann. tit. 18-A, § 2-804(b) ("jury may give damages not exceeding $500,000 for the loss of comfort, society and companionship of the deceased, including any damages for emotional distress").  In contrast, the Massachusetts wrongful death statute has no monetary limitations.  Mass. Gen. Laws ch. 229, § 2.

Maine's wrongful death statute also imposes a higher standard of liability and burden of proof than Massachusetts' wrongful death statute.  Specifically, Maine law allows recovery of punitive damages if the plaintiff establishes by clear and convincing evidence that the defendant acted with malice.  <u>Tuttle v. Raymond</u>, 494 A.2d 1353, 1361, 1363 (Me. 1985) (punitive damages available if plaintiff "can prove by clear and convincing evidence that the defendant acted with malice" and not available for gross negligence); Me. Rev. Stat. Ann. tit. 18-A, § 2-804(b). Massachusetts' wrongful death statute provides for the recovery of punitive damages upon a lesser showing of gross negligence and a lower burden of proof than clear and convincing evidence.  <u>See</u> Mass. Gen. Laws ch. 229, § 2 (punitive damages allowed when "decedent's death was caused by the malicious, willful, wanton or reckless conduct of the defendant or by the gross negligence of the defendant"); <u>Santos v. Chrysler Corp.</u>, No. 921039, 1996 WL 1186818, at *3 (Mass. Super. Sept. 18, 1996) (rejecting argument

that jury must find misconduct "by clear and convincing evidence" to award punitive damages based on gross negligence), <u>aff'd and remanded</u>, 715 N.E.2d 47 (Mass. 1999).  These differences in the wrongful death claim therefore warrant a choice of law analysis.

The other conflicts GE identifies include the reduction of the amount paid by a joint and severally liable, settling defendant from the amount of a non-settling defendant's share of adjudicated damages based on the settling defendant's proportionate degree of fault under Maine law.[11]  (Docket Entry # 162, pp. 4-5).  GE's position that Maine law always requires a reduction based on *proportionate* fault (Docket Entry # 162, pp. 4-5) (citing <u>Lavoie v. Celotex Corp.</u>, 505 A.2d 481, 483 (Me. 1986), and Me. Rev. Stat. Ann. tit. 14, § 156) as opposed to the *dollar amount* of the settlement, is not entirely accurate.  <u>See</u> Me. Rev. Stat. Ann. tit. 14, § 163; <u>Barclay v. Gressit</u>, 2:12-CV-156-JHR, 2013 WL 3819937, at *3 (D. Me. July 24, 2013) (discussing Me. Rev. Stat. Ann. tit. 14, §§ 156 and 163); <u>Stacey v. Bangor Punta Corp.</u>, 108 F.R.D. 72, 75-76 (D. Me. 1985) (explaining interplay between Me. Rev. Stat. Ann. tit. 14, §§ 156 and 163); <u>see also</u> <u>Goodwill v. Beaulieu</u>, 166 A.3d 127, 129 (Me. 2017).  In Maine:

---

[11]   Whereas plaintiff addresses the conflicts regarding the wrongful death statutes (Docket Entry # 170, pp. 15-16), she does not discuss the conflicts regarding contribution in the context of joint and several liability.

> the nonsettling joint tortfeasor against whom a verdict is
> entered possesses two distinct statutorily-based
> adjudicative options in respect to his contribution right:
> (1) the right to have the court precisely adjudicate the
> respective levels of the causative fault of all joint
> tortfeasors causing the plaintiff's entire damage under 14
> M.R.S.A. § 156; or (2) the right to have any verdict
> rendered against him reduced by the amount of the
> plaintiff's settlement with other joint tortfeasors under 14
> M.R.S.A. § 163.

Stacey v. Bangor Punta Corp., 108 F.R.D. at 75.  In addition,

"Contribution is denied in cases of intentional wrong and is

permitted only where liability is imposed for conduct that is not

morally blameworthy."  Bedard v. Greene, 409 A.2d 676, 677 (Me.

1979).

    In contrast, the statutory right of contribution in

Massachusetts "does not distinguish between intentional torts and

negligence."  Thomas v. EDI Specialists, Inc., 773 N.E.2d 415,

417 (Mass. 2002).  In addition, Massachusetts' regime of joint

and several liability allows "a plaintiff injured by more than

one tortfeasor" to "sue any or all of them for [his] full

damages."  Shantigar Found. v. Bear Mt. Builders, 804 N.E.2d 324,

332 (Mass. 2004).  "Tortfeasors who pay more than their 'pro

rata' (equal) share of damages may" seek contribution "from other

joint tortfeasors," but "tortfeasors who settle with the

plaintiff prior to entry of judgment are insulated from claims

for contribution from the remaining defendants (who are then

entitled to a setoff in the judgment *equal to the settlement*

*amount*)," id. (citations omitted and emphasis added), or the

13

"*amount stipulated by the release*[,]" whichever is greater.

Mass. Gen. Laws ch. 231B, § 4 (emphasis added).  The fact finder

does not assess the percentage of fault of the non-party

tortfeasors.  Id. at 332-333.

II.  Choice of Massachusetts or Maine Law (Wrongful Death Claim)

Where, as here, jurisdiction is based on the federal officer

removal statute, 28 U.S.C. § 1442(a)(1) ("section 1442(a)"),[12] a

federal court adheres to the forum state's choice of law rules to

determine the applicable substantive law.  See Baird v. Fed. Home

Loan Mortg. Corp., Civil Action No. 3:15CV00041, 2016 WL 6583732,

at *2 (W.D. Va. Nov. 4, 2016) ("'federal court's role under §

1442 is similar to that of a federal court sitting in diversity'"

with court applying "choice of law rule of the forum state")

(citations omitted), aff'd, 706 Fed. Appx. 123 (4th Cir. 2017)

(unpublished); Baldonado v. Avrinmeritor, Inc., Civil Action No.

13-833-SLR-CJB, 2014 WL 2116112, at *3 (D. Del. May 20, 2014)

(applying "choice of law rule of the forum state" in action

removed under section 1442(a)).  In multidistrict litigation, the

choice of law rules of the transferor court, i.e., Massachusetts,

---

[12]  Plaintiff and Burleigh initially filed this action in
Massachusetts Superior Court (Middlesex County) prior to
Burleigh's death.  Thereafter, GE filed a timely notice of
removal to this court, see 28 U.S.C. § 1446(b)(1), on the basis
that it was acting under the direction of a federal officer at
the shipyard when it constructed and repaired the marine steam
turbines in compliance with Navy specifications and it has a
colorable defense based on federal law.  See 28 U.S.C. §
1442(a)(1).

likewise apply where, as here, the transferor court is the
location of the original suit and also the forum state.  See In
re Fresenius Granuflo/NaturaLyte Dialysate Products Liability
Litigation, 76 F. Supp. 3d 294, 300-301 305 (D. Mass. 2015).

"In Massachusetts, courts resolve choice-of-law questions
'"by assessing various choice-influencing considerations,"
including those provided in the Restatement (Second) of Conflict
of Laws (1971).'" McKee v. Cosby, 874 F.3d 54, 59-60 (1st Cir.
2017) (quoting Cosme v. Whitin Mach. Works, Inc., 632 N.E.2d 832,
834 (Mass. 1994) (quoting Bushkin Assocs. v. Raytheon Co., 473
N.E.2d 662, 668 (Mass. 1985)).  With respect to torts and
personal injuries in particular, the Massachusetts Supreme
Judicial Court in Cosme identifies the following, applicable
sections in the Restatement (Second) of Conflict of Laws (1971)
("the Restatement"):

> Section 145 of the Restatement provides the general
> principle "applicable to all torts and to all issues in
> tort," id. at § 145 comment a, and § 146 of the Restatement
> provides a principle applicable in issues concerning causes
> of action involving personal injury.  Both sections require
> an examination of the relevant issue in accordance with the
> principles provided in § 6 of the Restatement.

Cosme v. Whitin Mach. Works, Inc., 632 N.E.2d at 834-35
(footnotes omitted).

Section 146 specifically "applies to personal injuries that
are caused either intentionally or negligently and to injuries
for which the actor is responsible on the basis of strict

15

liability."  <u>Restatement (Second) of Conflict of Laws</u> § 146 cmt.

a (1971).  It therefore applies to this personal injury

negligence and product liability action.  Section 146 instructs

that the "law of the state where the injury occurred determines

the rights and liabilities of the parties, unless, with respect

to the particular issue, some other state has a more significant

relationship under the principles stated in § 6 to the occurrence

and the parties . . .."[13]  <u>Restatement (Second) of Conflict of</u>

<u>Laws</u> § 146 cmt. a (1971).

The principles or "factors" in section six are:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum, (c) the relevant
policies of other interested states and the relative
interests of those states in the determination of the
particular issue, (d) the protection of justified
expectations, (e) the basic policies underlying the
particular field of law, (f) certainty, predictability and
uniformity of result, and (g) ease in the determination and
application of the law to be applied.

<u>Restatement (Second) of Conflict of Laws</u> § 6 (1971).  In

---

[13] Although not cited by the parties, section 175 of the
<u>Restatement</u> applies the same rule in section 146 to wrongful
death actions.  First, the language of section 175 tracks the
language of section 146.  Second, the comments to section 175
cross reference sections 145 and 146, including the comments
applicable to when the conduct and the injury occur in different
states.  <u>See</u>, <u>e.g.</u>, <u>Cohen v. McDonnell Douglas Corp.</u>, 450 N.E.2d
581, 586 n.10 (Mass. 1983).  In fact, the first comment in
section 175 unequivocally states that, "the law applicable to
wrongful death is selected by the same principles as control the
law applicable to personal injuries in general (see § 146)."
<u>Restatement (Second) of Conflict of Laws</u> § 175 cmt. a (1971).
Accordingly, it is not necessary to address section 175
separately from section 146.

balancing the section six factors, section 145(2) of the
<u>Restatement</u> also comes into play in a personal injury action.
See <u>Robidoux v. Muholland</u>, 642 F.3d 20, 25-26 (1st Cir. 2011)
(quoting and applying section 145(2) in personal injury case).
As stated by the First Circuit in <u>Robidoux</u>, in balancing the
section six factors:

> courts *should* consider various "contacts," including:  "(a)
> the place where the injury occurred, (b) the place where the
> conduct causing the injury occurred, (c) the domicile,
> residence, nationality, place of incorporation and place of
> business of the parties, and (d) the place where the
> relationship, if any, between the parties is centered."

<u>Id.</u> (emphasis added) (quoting section 145(2)); <u>see also</u> <u>Geshke v.
Crocs, Inc.</u>, 889 F. Supp. 2d 253, 260 (D. Mass. 2012) (product
liability action applying section 145).  Moreover, the comments
to section 146 repeatedly cross-reference the comments to section
145.  <u>See</u> <u>Restatement (Second) of Conflict of Laws</u> § 146 cmt. c-h
(1971).

Both plaintiff and GE devote a substantial portion of their
briefs addressing the various contacts in section 145(2).
Adhering to their framework and thereafter considering the
relevant contacts in determining, with respect to the particular
issues GE identifies vis-à-vis the wrongful death claim, whether
Massachusetts has a more significant relationship to the
occurrence and the parties than Maine under the principles in
section six pursuant to section 146, this court turns to the
analysis.

First and foremost, Maine is the place of injury because it is the location of Burleigh's exposure to asbestos.  It is also the place where he received the diagnosis.  See New v. Borg-Warner Corp., 13-00675-CV-W-DGK, 2015 WL 5167643, at *3 (W.D. Mo. Sept. 3, 2015) (noting that "[s]ome courts have held that the injury occurs where the diagnosis is made, not where the plaintiff is exposed to asbestos" but deeming it unnecessary to decide which controls because "place of exposure and diagnosis are the same").  Indeed, plaintiff acknowledges that, "Maine is where Mr. Burleigh resided, and was injured and treated." (Docket Entry # 170, p. 7).  In cases involving personal injuries, "the place where the injury occurred is a contact that, as to most issues, plays an important role."  Restatement (Second) of Conflict of Laws § 145 cmt. e (1971).  This case is no exception.

Turning to the second section 145(2) contact, GE maintains that the conduct causing the injury was Burleigh's exposure to asbestos in the vicinity of GE products and turbines in Maine. (Docket Entry # 162, p. 8).  To the contrary, the second contact addresses the conduct of the defendant, i.e., GE.  See Restatement (Second) of Conflict of Laws § 145 cmt. e (1971) (referring to "the defendant's conduct" in discussing "[t]he place where conduct occurred"); see also In re Fresenius Granuflo/NaturaLyte Dialysate Products Liability Litigation, 76

18

F. Supp. 3d at 307 ("Massachusetts courts have 'considered the location of events that constitute the alleged wrongdoing as essential for the substantial interest analysis"). The wrongful conduct of GE occurred primarily in Massachusetts where GE designed, manufactured, and then shipped the turbines to the shipyard in Maine or a Navy storage facility. GE also applied the asbestos-containing gaskets to turbines in Massachusetts and then shipped the gaskets and the turbines to the shipyard in Maine or a Navy storage facility. It additionally shipped asbestos-containing packing and asbestos-containing gaskets as loose parts from Massachusetts to the shipyard or a Navy storage facility.

Notably, whereas the "[c]hoice of the applicable law becomes more difficult in situations where," as here, "the defendant's conduct and the resulting injury occurred in different states," Restatement (Second) of Conflict of Laws § 145 cmt. e (1971), comment e to section 146 explains that the law of the state where the injury occurred "usually" applies in such circumstances. Restatement (Second) of Conflict of Laws § 146 cmt. e (1971) (when conduct and personal injury "occur in different states, . . . the local law of the state of injury will usually be applied") (citing to section 145). Furthermore, the law where the injury occurred carries even greater weight "when the injured person has a settled relationship to that state, either because he is

domiciled or resides there or because he does business there."
Id. Conversely, the law of the place of injury might not play an
important role "when the place of injury" is "fortuitous,"
Restatement (Second) of Conflict of Laws § 145 cmt. e (1971),
such as in a car accident when the non-resident plaintiffs are
"merely passing through" the state where the accident occurred.
Kramer v. Acton Toyota, Inc., No. 993733, 2004 WL 2697284, at *3
(Mass. Super. Ct. Nov. 2, 2004).  Here, the former principle
applies.  With the exception of four years in North Carolina and
a short time working at a job in New Hampshire, Burleigh resided,
lived, and worked in Maine.  His settled relationship to Maine
renders it all the more likely that Maine law applies.  See
Restatement (Second) of Conflict of Laws § 146 cmt. e (1971).

As indicted above, the third contact weighs in favor of
applying Maine law because Maine was Burleigh's domicile,
residence, and place of business throughout the relevant time
period and up until his death.  GE's recent change of its primary
place of business to Massachusetts (Docket Entry # 22, ¶ 2K)
(Docket Entry # 162, p. 8) (Docket Entry # 170, p. 3) does not
override Burleigh's consistent and enduring presence and
connection to Maine.  See In re Fresenius Granuflo/NaturaLyte
Dialysate Products Liability Litigation, 76 F. Supp. 3d at 307
("mere fact that a . . . defendant is a resident of Massachusetts
does not create a substantial interest").  It is true that GE's

20

purportedly wrongful conduct in Massachusetts lends additional
weight to GE's place of business contact in Massachusetts.  See
Restatement (Second) of Conflict of Laws § 145 cmt. e (1971)
(importance of domicile, residence, and place of business
"depends largely upon the extent to which they are grouped with
other contacts" and "state where these contacts are grouped is
particularly likely to be the state of the applicable law if
either the defendant's conduct or the plaintiff's injury occurred
there").  Burleigh's workplace at the shipyard for more than two
decades and his lifelong domicile and residence in Maine,
however, carry greater weight when grouped with the place of
injury in Maine than GE's wrongful conduct in Massachusetts when
grouped with its principal place of business in that state.  See
id.

It is also true that Massachusetts has an interest in
holding its resident defendant accountable for its conduct that
took place in Massachusetts and caused an injury to a
Massachusetts resident.  See Cosme v. Whitin Mach. Works, Inc.,
632 N.E.2d at 836; Restatement (Second) of Conflict of Laws § 145
cmt. d (1971) ("a state has an obvious interest in regulating the
conduct of persons within its territory and in providing redress
for injuries that occurred there").[14]  Here, although

---

[14]  Citing the above two sources and Watkins v. Omni Life
Science, Inc., 692 F. Supp. 2d 170 (D. Mass. 2010) ("Watkins"),
plaintiff overstates Massachusetts' interest in regulating the

Massachusetts has an interest in holding GE accountable for its
conduct, the injury took place in Maine and involved a Maine
resident.  These latter contacts reduce the comparative weight of
Massachusetts' above-noted interest vis-à-vis Maine's interest in
providing reasonable compensation for the wrongful death of a
Maine resident injured at his workplace in Maine.  Further,
Burleigh's beneficiary is herself a longtime Maine resident.

    As to the fourth contact, plaintiff submits that the
relationship between the parties is centered in Massachusetts.
(Docket Entry # 170, p. 8).  Relying on state court cases in
Texas and Washington, she contends that the relationship centers
around the wrongful conduct of GE in Massachusetts that caused
the injury, namely, the defective manufacturing and selling of

_____

conduct of resident defendants as "strong."  (Docket Entry # 170,
pp. 9-10).  Watkins is distinguishable because the case concerned
a putative class action.  Defendant Omni Life Science, Inc.
manufactured and designed the defective product, a replacement
hip, in Massachusetts and the named plaintiffs were Oklahoma
residents who underwent their hip replacement surgeries in
Oklahoma.  Id. at 174.  Recognizing, as does this court,
Massachusetts' interest in regulating the conduct of businesses
operating under its laws, id. at 175, the court found that the
interest trumped "any interest that Oklahoma might have because,
"[i]f this case were to achieve class action status, some 1,500
class members representing all fifty states would be affected"
and, "among this geographically diverse group, Massachusetts is
the only state that would have a substantive tie to all of the
class members."  Id.  This case does not involve a putative class
action with class members scattered across the United States.
Rather, it involves the estate of a decedent with strong,
longstanding ties to Maine who worked on products that GE shipped
for an extended time period to the shipyard in Maine or to a Navy
storage facility for use on a submarine at the shipyard.

asbestos and asbestos-containing products as well as the failure
to provide adequate instructions and warn foreseeable users of
the dangers of exposure to its asbestos-containing products.
(Docket Entry # 170, pp. 7-8) (Docket Entry # 134, ¶¶ 28-31, 35,
41).  An illustration in the Restatement demonstrates that the
plain meaning of the "*relationship* . . . *between* the parties,"
Restatement (Second) of Conflict of Laws § 145 (1971) (emphasis
added), does not necessarily incorporate a requirement to
consider the defendant's causative conduct exclusive of the
defendant's interactions with the plaintiff that form the
relationship.  See id. § 145 cmt. e, ill. 1 (1971).  The
illustration exemplifies that, even though the wrongful conduct
consisting of negligence and the injury took place in one state,
i.e., state Y, the parties' relationship was centered in another
state, i.e., state X.  Id.; see, e.g., Harrigan v. New England
Dragway, Inc., Civil Action No. 13-10132-JCB, 2014 WL 12589625,
at *5 (D. Mass. Jan. 2, 2014) ("relationship between the parties
is centered on Dylan's participation in motocross activities at
Dragway's MX101 track"); Ogburn-Sisneros v. Fresenius Med. Care
Holdings, Inc., 2013-05050, 2015 WL 6437773, at *3 (Mass. Super.
Oct. 19, 2015) (products liability claims involving failure to
warn in which parties' relationship centered in Colorado "given
that the only connection between Fresenius and the decedent was
GranuFlo, which was administered during the decedent's dialysis

treatment in Colorado" notwithstanding manufacture of "GranuFlo in Ohio and Texas").  Finally, in a failure to warn and product design defect case involving an injured plaintiff, the parties may lack any "prexisting relationship." La Plante v. Am. Honda Motor Co., Inc., 27 F.3d 731, 741-42 (1st Cir. 1994); see also Restatement (Second) of Conflict of Laws § 145 (1971) (factor in choice-of-law analysis is place where the relationship, "if any," of the parties is centered).

In the case at bar, Burleigh worked at the shipyard in Maine and recalls working on GE turbines.  Although Burleigh did not know Tidd, the relationship between Burleigh and GE centered around his work on GE products for two decades at the shipyard. On balance, the fourth contact favors the application of Maine law.  In sum, the contacts in section 145(2) weigh heavily in favor of Maine.

Overall, section 146 requires considering whether a state other than Maine, i.e., the place where the injury occurred, has a more significant relationship under the principles in section six with respect to the occurrence and the parties vis-à-vis the particular issue.  Restatement (Second) of Conflict of Laws § 146 (1971).  The analysis entails considering the interests of Maine and Massachusetts "on the basis, among other things, of the purpose sought to be achieved by their relevant local law rules and of the particular issue." Id. § 146 cmt. c; accord

24

Restatement (Second) of Conflict of Laws § 145 cmt. c (1971)
("interest of a state in having its tort rule applied" to
determine "a particular issue will depend upon the purpose sought
to be achieved by that rule and by the relation of the state to
the occurrence and the parties").  The "principles in section
six," id. § 146, similarly include the "policies of other
interested states and the relative interests of those states in
the determination of the particular issue."  Id. § 6(2)(c).

Plaintiff argues that the absence of a cap on punitive
damages, one among several issues here, see, e.g., Robidoux v.
Muholland, 642 F.3d at 27 (determining choice of law and stating
that, "the issue here pertains to the application of workers'
compensation immunity rules"), evidences Massachusetts' interest
in punishing and deterring malicious conduct.  (Docket Entry #
170, p. 16).  She correctly points out that, if the purpose of
the tort law involved "is to punish the tortfeasor and thus to
deter others from following his example, there is better reason
to say that the state where the conduct occurred is the state of
dominant interest."  Restatement (Second) of Conflict of Laws §
146(2) cmt. e (1971).

The absence of a cap on the recovery of punitive damages in
the Massachusetts wrongful death statute undeniably serves the
purposes of condemnation and deterrence.  See Aleo v. SLB Toys
USA, Inc., 995 N.E.2d 740, 754 & n.19 (Mass. 2013) ("statute . .

25

. does not set a maximum award.  We have stated that the purposes of punitive damages include 'condemnation and deterrence'" and "'there is nothing wrong with making it very expensive to kill people'"); see also Santos v. Lumbermens Mut. Cas. Co., 556 N.E.2d 983, 990 (Mass. 1990) ("'purposes underlying the allowance of punitive damages . . . are punishment of the defendant and deterrence of future wrongdoing'") (citing Mass. Gen. Laws ch. 229, § 2); Kowalski v. Gagne, 914 F.2d 299, 302 (1st Cir. 1990) (acknowledging "punitive nature of the statute").  The $500,000 limit for punitive damages in the Maine wrongful death statute, in turn, prevents a limitless recovery.  See generally Tuttle v. Raymond, 494 A.2d at 1361 (rejecting imposition of punitive damages for reckless conduct to avoid, in part, allowing "'limitless imposition of punitive damages'").

The purpose for the provision in Maine's punitive damages statute that restricts actionable conduct to malice rather than gross negligence is also deterrence and condemnation of reprehensible conduct.  See Tuttle v. Raymond, 494 A.2d at 1361. More specifically, the reason for limiting the misconduct to malicious activity is because expanding the actionable conduct lessens "and dulls the potentially keen edge of the [punitive damages] doctrine as an effective deterrent of truly reprehensible conduct."  Id.  The purpose of Maine's punitive damages law therefore reinforces the need for deterrence by

limiting the conduct to a defined and precise category of misconduct.  Id.  Maine's imposition of a clear and convincing standard of proof fosters a similar purpose of avoiding a loose assessment of punitive damages in light of their serious potential consequences.  See id. at 1363 ("although punitive damages serve an important function in our legal system, they can be onerous when loosely assessed" and their "potential consequences . . . warrant a requirement that the plaintiff present proof greater than a mere preponderance of the evidence"); see also Batchelder v. Realty Resources Hosp., LLC, 914 A.2d 1116, 1124 (Me. 2007) (purpose of higher standard is to "avoid[] an overbroad application of an extreme remedy for egregious cases").

Because the misconduct of applying asbestos-containing gaskets to turbines and the decision not to warn workers at the shipyard of the dangers posed by asbestos occurred in Massachusetts, the deterrent and condemnation purposes of the unlimited recovery in the Massachusetts statute are well served thereby strengthening Massachusetts' interest in regulating the conduct of its resident defendant.  See Restatement (Second) of Conflict of Laws § 146 cmt. e (1971).  On the other hand, Maine has an interest in protecting its citizens from egregious misconduct, which it deters in an assertedly more effective manner than Massachusetts with a narrower and more precise malice

27

standard in the Maine statute.

Another related and relevant issue is the statutory cap
Maine imposes on non-economic, compensatory damages in a wrongful
death action.  The underlying basis for the cap is "to establish
a *reasonable* limit on the damages in wrongful death cases."
<u>Carter v. Williams</u>, Civil Action No. 98-24, 2001 WL 1736582, at
*10 (Me. Super. June 19, 2001) (examining prior version that
increased statutory limit from $75,000 to $150,000) (emphasis
added), <u>aff'd</u> <u>in</u> <u>part</u>, <u>vacated</u> <u>in</u> <u>part</u>, 792 A.2d 1093 (Me. 2002);
<u>see</u> <u>generally</u> <u>Batchelder v. Realty Resources Hosp., LLC</u>, 914 A.2d
at 1121 (malice standard avoids "'allow[ing] virtually limitless
imposition of punitive damages,'" and "'overextend[ing] the
availability of punitive damages'").  The purpose of the absence
of a statutory maximum for such compensatory damages under the
Massachusetts statute is to redress the loss to the plaintiff.
<u>Aleo v. SLB Toys USA, Inc.</u>, 995 N.E.2d at 753 ("'compensatory
damages are intended to redress the concrete loss that the
plaintiff has suffered by reason of the defendant's wrongful
conduct'"); <u>Matsuyama v. Birnbaum</u>, 890 N.E.2d 819, 835 (Mass.
2008) ("purpose of the wrongful death statute is 'to compensate a
decedent's survivors for the loss of the decedent's life'").
Massachusetts' interest in applying this rule is greatly reduced,
however, because Burleigh as well as his widow and beneficiary
are not Massachusetts residents and Burleigh's injuries occurred

28

in Maine.  Moreover, it would be anomalous for Maine to insist on providing greater benefits to its citizens under another state's law than it provides to its citizens under its own law.  See generally Burgio v. McDonnell Douglas, Inc., 747 F. Supp. 865, 872-73 (E.D.N.Y. 1990) ("state's interest is not merely that which will bring its citizens the greatest benefits" and "it would be anomalous for New York to insist on greater benefits for its plaintiffs abroad than it allows them at home") (applying New York law to loss of consortium claim and damages in wrongful death action).  On balance, Massachusetts' interest in regulating the conduct of businesses operating in its state and deterring their misconduct is furthered by applying the Massachusetts statute somewhat more than Maine's interest in awarding a reasonable amount to its resident or deterring others is furthered by applying the Maine wrongful death statute.  See generally Restatement (Second) of Conflict of Laws § 146 cmt. e (1971).

Having considered the policies of the forum and the interests of Massachusetts and Maine, the remaining factors in section six are either not particularly relevant, neutral, or favor the application of Maine's wrongful death statute.  See generally Bushkin Associates, Inc. v. Raytheon Co., 473 N.E.2d at 670 ("borrow[ing] from any of the various lists to help focus our attention on the considerations particularly relevant to the case

29

before us"); accord Robidoux v. Muholland, 642 F.3d at 27

("'[b]ecause some of the relevant factors are either redundant or

not determinative, we focus on considerations particularly

relevant to the case'") (quoting Jasty v. Wright Med. Tech.,

Inc., 528 F.3d 28, 40 (1st Cir. 2008), with brackets omitted).

The parties had a justified expectation that Maine law would

apply.  The injury took place in Maine at a workplace where GE

had a longtime presence and where Burleigh worked for more than

two decades on, inter alia, GE turbines.  Burleigh had no contact

with GE products in Massachusetts.

In addition, "the state where the injury occurred will

usually be readily ascertainable" thereby fostering "the choice-

of-law values of certainty" and predictability.  Restatement

(Second) of Conflict of Laws § 146 cmt. c (1971).  The uniformity

of result slightly favors Massachusetts because GE manufactured

the turbines and applied the gaskets to the turbines and, as

reasoned by plaintiff, presumably sold them in several different

states.  The uniformity of result, however, is also served by

applying the law of the state where the injury occurred.  See id.

("rule furthers the choice-of-law values of . . . uniformity of

result and, since the state where the injury occurred will

usually be readily ascertainable, of ease in the determination

and application of the applicable law").  The ease in determining

Massachusetts or Maine law is neutral inasmuch as the contours of

the law in both states is well established.

As a final matter, plaintiff contends that <u>Ristaino v. D.C.
Bates Equip. Co., Inc.</u>, No. 03-1178, 2004 WL 1171247 (Mass.
Super. Ct. May 12, 2004) ("<u>Ristaino</u>"), involves the same facts as
the case at bar and warrants the same result, namely, application
of Massachusetts law to a non-resident plaintiff injured outside
of Massachusetts by a product sold and installed in Massachusetts
by a Massachusetts corporation.  (Docket Entry # 170).
Notwithstanding these similar facts, <u>Ristaino</u> is distinguishable
for a number of reasons.  First, <u>Ristaino</u> involved applying a
statute of limitations under section 142 of the <u>Restatement</u>,
which presents a somewhat different legal analysis than section
146.  <u>See id.</u> at *1-2; <u>Restatement (Second) of Conflict of Laws</u> §
142 (1971) ("section 142").  Section 142 provides that:

> under choice of law principles set forth in § 6, the forum
> State generally will apply its own statute of limitations to
> permit a claim unless:  "(a) maintenance of the claim would
> serve no substantial interest of the forum; and (b) the
> claim would be barred under the statute of limitations of a
> state having a more significant relationship to the parties
> and the occurrence."

<u>Nierman v. Hyatt Corp.</u>, 808 N.E.2d 290, 292 (Mass. 2004) (quoting
section 142).  The correct focus is "'on the statute of
limitations issue, and not on the underlying tort.'"  <u>Id.</u> at 293.
Second, the <u>Ristaino</u> court deemed it significant that the
Massachusetts resident defendant defended the Ristainos' first
lawsuit brought in New Jersey on a jurisdictional basis that it

31

lacked minimum contacts with New Jersey and the second lawsuit
brought in Massachusetts on the basis that *New Jersey*'s statute
of limitations applied.  <u>Ristaino</u>, 2004 WL 1171247, at *1, 3.
Such circumstances do not exist in the case at bar.  Third, the
absence of a New Jersey forum appeared to strengthen
Massachusetts' interest in providing a forum for persons injured
by the conduct of its resident defendant.  <u>See id.</u> at *3.  Here,
plaintiff has an alternative forum for a wrongful death claim by
filing an action in her own state.  Fourth, unlike GE which had a
longstanding connection to the shipyard in Maine, the resident
defendant in <u>Ristaino</u> installed a winch on a truck, "delivered
the truck to Mass. Electric in Boston[,]" and thereafter had no
"involvement with the truck or with the New Jersey construction
project on which Mr. Ristaino was injured" when his hand became
entangled in the winch.  <u>Id.</u> at *1.

In sum, although the purposes served by the two laws gives
this court pause, on balance Massachusetts does not have a more
significant relationship than Maine to the occurrence and the
parties under the principles in section six with respect to the
amount of non-economic compensatory and punitive wrongful death
damages; the burden of proof in a wrongful death action; and the
standard of conduct required to recover punitive damages in a
wrongful death action.

III.  <u>Choice of Massachusetts or Maine Law (Contribution)</u>

The remaining joint and several liability issues relative to contribution implicate the apportionment of liability and amount of damages between the remaining defendants (GE, Crane, and Warren) and potentially the settling defendants, particularly in the event Maine law applies.  See Me. Rev. Stat. Ann. tit. 14, § 156; cf. Shantigar Found. v. Bear Mt. Builders, 804 N.E.2d at332-334 & n.12 (citing, inter alia, Me. Rev. Stat. Ann. tit. 14, § 156).  GE, Crane, and Warren seek to apply Maine law.  Plaintiff does not address or discuss the joint and several liability issues relative to contribution.[15]  She therefore waives any opposition to GE's argument to apply Maine law to the contribution issues.  See Coons v. Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) ("district court was 'free to disregard' the state law argument that was not developed in Coons's brief").

Section 173 of the Restatement dictates that section 145 "determines whether one tortfeasor has a right of contribution or indemnity against another tortfeasor."  Restatement (Second) of Conflict of Laws § 173 (1971) ("section 173").  The rule applies to settling tortfeasors.  See id., § 173 cmt. a (law selected under section "145 determines whether contribution can successfully be sought against a joint tortfeasor who has been given a release by the plaintiff").  Contacts consisting of the

_____

[15]   See footnote 11.

33

place of the injury and the domicile, residence, and workplace in
Maine create the justified expectation that Maine law would
apply.  Certainty, predictability, and uniformity are well served
by applying the law of the place of the injury.  As discussed
previously, the contacts in section 145 favor the application of
Maine law.

        In Massachusetts, contribution "is designed equitably to
distribute damages among all those liable in tort for the same
offense." Berube v. City of Northampton, 602 N.E.2d 560, 562
(Mass. 1992) (discussing Massachusetts General Laws chapter 231,
section one); McGrath v. Stanley, 493 N.E.2d 832, 835 (Mass.
1986) ("contribution statute is aimed at eliminating" unfairness
of one tortfeasor bearing disproportionate share of a plaintiff's
recovery).  In Maine, contribution serves a similar purpose of
"ensur[ing] fairness between joint tortfeasors whose negligence
caused a third party harm." Estate of Dresser v. Maine Medical
Ctr., 960 A.2d 1205, 1207 (Me. 2008).  Massachusetts thus has a
greater interest than Maine in applying its contribution laws to
GE because the company has its principal place of business in
Massachusetts.  The facts regarding the location of the
manufacturing, design, and sale by Crane and Warren of their
products; GE's application, if any, of those products to the
steam turbines GE manufactured in Massachusetts and shipped to
Maine; and Burleigh's use of Crane and Warren products at the

shipyard, however, are not well developed.

At this juncture, in light of the weight of the section 145(2) contacts and considering the interests of the two states in applying their respective law, Maine appears to have the more significant relationship with the parties and the occurrence than Massachusetts.[16]  As urged by the remaining defendants, this court therefore concludes that Maine law applies to the contribution issues at this point in the proceedings.

CONCLUSION

In accordance with the foregoing discussion, the motion to apply Maine law (Docket Entry # 161) is **ALLOWED**.


                              /s/ Marianne B. Bowler
                              **MARIANNE B. BOWLER**
                              United States Magistrate Judge

---

[16]  As facts develop, however, Massachusetts' interest vis-à-vis Maine's interest may override the weight of the forgoing contacts and factors that favor the application of Maine law such that the trial judge may deem it more appropriate to apply Massachusetts law.